## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DEIRDRE KELLY HECTOR,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | **CIVIL ACTION FILE** |
| **XAVIER BECERRA,** ) | **NO.: _____** |
| **SECRETARY, UNITED STATES** ) | |
| **DEPARTMENT OF HEALTH** ) | |
| **AND HUMAN SERVICES (HHS),** ) | **JURY TRIAL DEMANDED** |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## PLAINTIFF'S COMPLAINT

COMES NOW, Plaintiff DEIRDRE KELLY HECTOR ("Plaintiff" or Mrs. Hector"), and files this, her Complaint, showing the Court the following:

## I.

## NATURE AND PURPOSE

1.

This is an action for discrimination, retaliation, damages, declaratory and injunctive relief authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 as amended, including the Civil rights Act of 1991, 42 U.S.C. § 2000e *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII").

1

2.

This lawsuit is brought because Defendant, XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, ("Defendant" or "HHS"), pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et seq.* ("Title VII"), for maintaining a policy, practice, custom or usage of discrimination against Mrs. Hector, in regard to terms, conditions and privileges of employment, and for damages, back pay and other equitable relief for Mrs. Hector, who has been discriminated and retaliated against by Defendant on the basis of her race, gender and reprisal (prior EEOC activity).

## II.

## <u>JURISDICTION AND VENUE</u>

3.

This action is brought for a declaratory judgment, injunctive relief and compensatory damages, pursuant to 42 U.S.C. Section 1983, 20 U.S.C. Sections 1681-1688, 28 U.S.C. Sections 2201 and 2202, and Title VII.  This Court has jurisdiction to hear the Mrs. Hector's claims pursuant to 28 U.S.C. Sections 1331, 1343(3) and (4) 1337 and 42 U.S.C. 2000e-5(f) [Section 706(0(s) and (3) and 704(a) of Title VII].

4.

Venue is proper in the Northern District of Georgia, Atlanta Division pursuant to 28 U.S.C. Section 1391(b) as Fulton County, Georgia is the County where the Defendant operates the Center for Disease Control and Prevention ("CDC"), the employer's business location and when Mrs. Hector was employed.

## III.

## EXHAUSTION OF ADMINISTRATIVE PROCEDURES

5.

On March 5, 2020, Mrs. Hector filed a Formal Complaint of Discrimination against CDC. (Exhibit 1).

6.

As set out in her Complaint, Mrs. Hector contended that each of the following actions taken against her constitute disparate treatment and harassment on the bases of race (Black), sex (female), and retaliation (for prior EEO activity), in the following actions:

a.      During February 2019, Complainant stated that her supervisor referred to her as the Administrative Officer rather than as a Management Official.

b.      In Memorandum dated December 11, 2019, Complainant stated that her supervisor falsely stated that she counseled Complainant on April 2, 2019 regarding inappropriate behavior during a meeting with Human Resource Officer (HRO), and

on July 26, 2019, Complainant supervisor placed the same information in a summary.

c.     During May 2019, Complainant supervisor spoke to Complainant in a disrespectful manner on two occasions.

d.     During June 2019, Complainant's supervisor dismissed Complainant's professional opinion, but received the professional opinions of other staff members, and instructed Complainant to write Complainant's performance plan.

e.     On June 20, 2019, Complainant was informed by a co-worker (who volunteered assistance) that Complainant's supervisor would not allow the co-worker to assist Complainant on a project.

f.     On June 25, 2019, Complainant was subjected to disrespectful, bullying and threatening behavior.

g.     On July 2019-December 2019, Complainant was removed from the direct reports meeting while all other GS-14 and above employees were allowed to attend.

h.     On January 7, 2020, Complainant was denied a meeting with Complainant's supervisor regarding a letter of counseling received by Complainant on December 11, 2019.

i.     On January 29, 2020, Complainant received a Performance Management Appraisal Program rating that did not accurately reflect Complainant's performance.

7.

On June 24, 2020, Mrs. Hector received a Letter of Acceptance from the Equal Employment Opportunity Compliance and Operations Division. (Exhibit 2).

8.

On September 25, 2020, Mrs. Hector Mrs. Hector requested a Hearing before the Equal Employment Opportunity Commission ("EEOC").

9.

The Complainant, Mrs. Hector, and the Agency, HHS, attended an Initial Conference on March 30, 2021, where the Administrative Law Judge issued a Scheduling Order.

10.

On August 3, 2021, pursuant to the Scheduling Order, the Agency filed its Motion for a Decision Without a Hearing, and Mrs. Hector filed her Response to the Agency's Motion for a Decision Without a Hearing on August 26, 2021.

11.

On February 15, 2022, the Administrative Law Judge issued a Decision and Order Granting the Agency's Motion for Summary Judgment. (Exhibit 3).

12.

On March 1, 2022, the Agency issued a Final Order with Appeal rights. (Exhibit 4).

13.

Ninety (90) days has not expired from the date of receipt of the Agency's Final Decision.

14.

Plaintiff has complied with all other conditions precedent to the institution of this lawsuit and the claims herein, including having exhausted her administrative remedies.

**IV.**

**PARTIES**

15.

Plaintiff, Deirdre Kelly Hector, is an African American female citizen of the United States and a resident of Gwinnett County, Georgia.

16.

Defendant, Xavier Becerra, is the Secretary of the United States Department of Health and Human Services and according to the Agency's Final Order dated March 1, 2022, is the appropriate Defendant in Title VII cases. (Exhibit 4).

17.

Defendant is an employer within the meaning of Title VII (42 U.S.C. 2000e, *et seq.*).

## V.

## **FACTUAL ALLEGATIONS**

18.

Mrs. Hector is a Black/African American female.

19.

At all relevant times, Mrs. Hector served as the OEEO Management Official. Her duties as a Management Official were not ancillary, as she did not perform them for someone else, they were her responsibility.

20.

Mrs. Hector asked Ms. Griffiths why she repeatedly referred to her as a program management officer (PMO) versus the Management Official. Ms. Griffiths stated, "because you are". Mrs. Hector said that she serves as the management official for this office and had for many years. Mrs. Hectors was listed on the CDC official directory as the OEEO Management Official and not as the PMO. Ms. Hector reminded Ms. Griffiths several times when she referred to her as the PMO, that she is the Management Official.

21.

On March 29, 2019, there was a conference call with HRO that both Ms. Griffiths and Mrs. Hector attended. Ms. Griffiths could not have seen any non-verbal gestures, as she claimed, because they were on a conference call.

22.

Ms. Griffiths and Mrs. Hector were on a telephone conference call on March 29, 2019, with HRO.  Mrs. Hector muted her phone when other people were speaking.  There were several other individuals on the telephone conference call. Ms. Vanessa Gordan was present in Mrs. Hectors' office during this telephone call.

23.

At no time did Mrs. Hector make any non-verbal gestures or make any verbal sounds such as "um," nor did she smack her lips during the telephone conference call.

24.

At no time on April 2, 2019, did Ms. Griffiths counsel Mrs. Hector or tell her that she was counselling her.  Mrs. Hector had multiple telephone calls with Ms. Griffiths, and never once did she mention or inform her at the March 29, 2019 meeting, by informing her that her conduct was inappropriate and unprofessional.

25.

On Tuesday, May 28, 2019 at 6:21 p.m., Ms. Griffiths requested a list of the reports that Mrs. Hector was responsible for updating and timeframes (month, quarterly, annually).  Mrs. Hector provided the information to Ms. Griffiths the next morning at 9:57 a.m.  After Ms. Griffiths received the information, she sent Mrs. Hector an email requesting the additional information: "what (description), where (who receives it) and how (how coordinated)".  Mrs. Hector found this email to be offensive.  Mrs. Hector responded back specifically to what Ms. Griffiths requested.

26.

Ms. Griffith said in her May 28, 2019 email, that she was not aware of the policy updates, and that she did not want anything else to fall thru. The policy letters were the responsibility of the Policy Specialist Y. Teresa Brown.

27.

In response to Mrs. Hector's email dated June 14, 2019, Ms. Griffiths sent several emails at different times further confusing and not clarifying her original email.

28.

Ms. Brown was instructed by Ms. Griffiths to review the SOP on PII.  When Mrs. Hector discussed Ms. Browns review with her, she volunteered to assist her in finishing the assignment.  Ms. Brown was allowed to assist others in completing

their updated SOPs.  However, Ms. Griffiths did not allow Ms. Brown to assist Mrs. Hector, as per Ms. Brown's June 20, 2019 email, and Ms. Griffiths email dated June 26, 2019.

29.

The Personally Identifiable Information (PII) standard was already written. Ms. Griffiths wanted it in a different template and continuously asked for modifications. The communications and persons assisted with the rewrites and updates of the other areas but the same was not afforded to Ms. Hector.

30.

The revised PII SOP was delayed because Ms. Griffiths continuously asked for revisions, would not provide clarity, and Mrs. Hector was denied assistance from Ms. Brown by Ms. Griffiths.   Additionally, Mrs. Hector had other pressing assignments to complete.

31.

Ms. Griffiths would not accept Mrs. Hector's emails as weekly status reports; however, Ms. Brown sent her an email on Thursday June 20, 2019 at 2:37 p.m., and Ms. Griffiths notes this email as she was informed in a weekly status report that Ms. Brown was assisting Mrs. Hector with the PII.

32.

Ms. Brown told Mrs. Hector that based on her conversation with Ms. Griffiths, she was told that she could not assist her with the PII SOP.

33.

Ms. Brown and another employee serving on detail as a communications specialist were allowed to assist other co-workers in completing documents assigned to them, but Mrs. Hector was not afforded the same opportunity.  Ms. Brown offered to help Mrs. Hector, but Ms. Griffiths would not allow her too.

34.

In the email dated June 20, 2019 at 2:37 p.m., Ms. Brown emailed Ms. Griffiths about the conversation she had with Mrs. Hector.  Ms. Brown told Mrs. Hector that based on her conversation with Ms. Griffiths, she was told that she could not assist her with the PII SOP.  The email from Ms. Brown to Ms. Griffiths was misleading and the opposite of what Ms. Brown told Mrs. Hector.

35.

In an email sent on June 20, 2019 at 3:17 p.m., from Ms. Brown, she stated that she was giving Mrs. Hector a heads up and that even though she volunteered to help her, Ms. Griffiths told Ms. Brown that she had other priorities and could not help with the PII SOP.

36.

Less than an hour later on the same date, Ms. Brown emailed Ms. Griffiths and described the conversation with Mrs. Hector as, "a pretty extensive consultation." She also stated that Mrs. Hector raised questions about Ms. Brown's feedback, as well as feedback from Ms. Griffiths and another employee.

37.

Ms. Brown stated that Mrs. Hector expressed feeling frustrated, which she said was obvious during the call, and she felt that she thought she clarified the outstanding items to be addressed. Furthermore, she continued by saying hopeful that the next version will be more in line with what they need.

38.

On June 25, 2019, Mrs. Hector met with Ms. Griffiths. Ms. Griffiths yelled at her and said other things like: (1) "I'm telling you the way you communicate is not acceptable and needs work"; (2) "You are not approachable"; (3) "you put the office in jeopardy"; and (4)"you don't come out and interact with people, specifically her; These remarks were inappropriate and unprofessional.

39.

At no time during the conversation between Ms. Griffiths and Mrs. Hector on June 25, 2019, did Ms. Griffiths tell Mrs. Hector this was a counselling session. In fact, after the conversation, Mrs. Hector emailed Mr. Mebane the OEEO Director

about the conversation and asked him to intervene. Ms. Mebane did not find anything wrong with what Ms. Griffiths said or wrote.  In fact, every time Mrs. Hector asked Mr. Mebane for assistance nothing changed, Ms. Griffiths demeaner towards her worsen.

40.

Ms. Griffiths never once in the conversation held between her and Mrs. Hector, did she indicate it was a counselling session.  In the memo Ms. Griffiths sent to Mrs. Hector on June 26, 2019, she says, "thank you for the conversation yesterday".  If it was a counselling session, she would have stated so in the email so that everyone was clear.

41.

On June 27, 2019, Mrs. Hector requested Mr. Mebane intervene after she received the email from Griffiths in which she says, "thank you for our conversation yesterday".  Ms. Griffiths did not indicate this is a counseling, she described it as a simple conversation. Ms. Griffiths further said, "You will communicate directly with me if you need clarification on any work assignments you have been assigned by me". "Once an assignment has been assigned any concerns with the assignment will be discussed with me not other staff"; and "all your responsibilities (current and previous, including those performed by the acting Deputy director during his detail)

will be discussed and shared with me (and other staff if requested)".  "We both also agreed to work on communicating more effectively moving forward".

42.

Mrs. Hector was offended by what Ms. Griffiths wrote and the tone, and went to make Mr. Mebane aware and asked him for assistance.  Mrs. Hector provided examples to Mr. Mebane on previous incidents and informed him that she felt bullied, offended, micro-managed and disrespected.

43.

Mrs. Hector informed Mr. Mebane that Ms. Griffiths was trying to discredit me professionally and jeopardize my employment.  Mr. Mebane met with me a few weeks later and said he did not feel the same.  Mrs. Hector asked him to ask my coworkers what their impressions were, and he said he would.  However, she did not believe he investigated her concerns as nothing changed with Ms. Griffiths.

44.

Ms. Brown joined the OEEO office after Ms. Griffiths became the deputy. She initially come on detail to the office around April 2019, and then became permanent to OEEO after a policy specialist position was announced and she was selected.  Ms. Brown position title was Policy Specialist, however Ms. Griffiths retitled her, not through HRO, the Associate Director for Policy. Ms. Griffiths told Mrs. Hector that she did not want to belittle Ms. Brown by calling her a Policy

Specialist. However, Ms. Griffiths was fine with belittling Mrs. Hector and calling her a PMO verse the Resource Manager or Management Official.

45.

Ms. Brown was never a direct report of Mr. Mebane. Ms. Griffiths came to OEEO in February 2019 and detailed Ms. Brown to the office shortly after she arrived. Since in OEEO, Ms. Brown has always been a direct report of Ms. Griffiths.

46.

Ms. Griffiths did not investigate the claims of Ms. Brown prior to accusing Mrs. Hector of not working well with other staff.  Ms. Brown stated that it was difficult working with Mrs. Hector.  As examples of her claims, Ms. Brown submitted an email for the EXPO transition dated July 25, 2019 at 4:49 p.m., which was after their June 25, 2019 meeting.

47.

For months, Mrs. Hector asked Ms. Griffiths what her responsibilities were, and she would not provide her with any details.  Mrs. Hector gave her a list of everything that she used to be responsible for and she said she was "overwhelmed".

48.

After multiple requests and frustration for a lack of clarity, Ms. Griffiths finally sent Mrs. Hector something in writing on July 26, 2019, while she was out on extended sick leave.  It is important to understand that Mrs. Hector first started

asking for this information in February 2019.  In March 2019, Mrs. Hector received a very vague listing. She continued asking for details but was ignored by Ms. Griffiths and Mr. Mebane.   Ms. Griffiths made references to Mrs. Hectors' responsibilities in her July email, and she further clarifies in her response email dated July 29, 2019.

49.

In Ms. Brown's email to Ms. Griffiths on Monday, July 29, 2019 at 3:21 p.m., it appeared Ms. Brown and Ms. Griffiths had a previous conversation about Mrs. Hector after she was on medical leave.  It is unclear what the original question was asked of Ms. Brown, however, she provided an account over a month later of the conversation and working relationship with her.

50.

Ms. Brown said that Mrs. Hector was frustrated by the assignment and disagreed with some of the guidance she received.  Ms. Brown said that she was clear with Mrs. Hector that she had informed Ms. Griffiths of such, as well as her attempts to move past her frustrations to get the work done (e.g., offering to help with the appendix). Ms. Brown said that she did not at any time say that everything was fine about the discussion.

16

51.

Ms. Brown further stated that it was difficult working with Mrs. Hector.  As examples of her claims, Ms. Brown submitted an email for the EXPO transition dated July 25, 2019 at 4:49 p.m., indicating that Mrs. Hector would provide the following: "1) We agreed that Deirdre would provide a final written update to everyone today, and you and I will do so going forward, including updates to Linnet and Reggie. 2) please cancel the invite you have for subsequent weeks, and let everyone know that Marguaree or I will send a new meeting invite out for the same date and time." Ms. Hector provided the final written update the same day at 6:58 p.m.  Additionally, Ms. Hector cancelled the previous meeting request at 8:01 p.m. the same day.

52.

While Mrs. Hector was on leave during the direct reports meeting, she would have still been invited.  Mrs. Hector would have received the meeting invite series for the standard meeting.

53.

Mrs. Hector had concerns with the then proposed and now implemented customer service element that Ms. Griffiths put in her performance plan.  During a meeting in June 2019, Ms. Griffiths discussed the new customer service element she was going to implement. Mrs. Hector expressed her concern when asked, and Ms.

Griffiths immediately cut her off and turned to engage someone else when she opposed. Her demeanor and actions were unprofessional, dismissive, and hostile towards Mrs. Hector. The overall concern she had was the language "wording" of the element.

54.

In or around 2018 the sitting president signed an executive order 13839 [https://ballotpedia.org/Presidential_Executive_Order_13839_(Donald_Trump,_20 18)]. This order pertains to Management, grievances, and records. The order required agency heads to aim to exclude disputes over employee removals for misconduct or unacceptable performance, among other issues, from grievance procedures. The order also instructed agencies to provide no more than a 30-day period to demonstrate acceptable employee performance. Lastly, the order did not allow agencies to "erase, remove, alter, or withhold from another agency any information about a civilian employee's performance or conduct in that employee's official personnel records" as a condition of resolving a complaint or settlement.[3] This EO was codified as federal regulations and therefore the language put in performance plans needed to be critically reviewed as the language could be a problem as perform plans are subjective to the managers discretion and bias when evaluating employees. Additionally, if there is no mechanism for tracking metrics or language how can or do you know it is consistently applied across the enterprise.

18

55.

Ms. Griffiths claimed they reviewed Mrs. Hector's plan and mid-year during her mid-year performance review prior to Mrs. Hector going on medical leave in July 2019.  As the system is properly documented, Ms. Griffiths did not enter Mrs. Hector's performance plan into the system until after Ms. Hector was on medical leave.  Ms. Griffiths approved the performance plan in the system on July 29, 2019; Mr. Mebane, the reviewer, approved the plan on July 30, 2019; Ms. Griffith reviewed, certified, and published the performance plan to Mrs. Hector on July 30, 2019.  When Mrs. Hector returned to the office in January, she reviewed and acknowledged the plan on Jan 17, 2020, and indicated that a meeting did not occur.

56.

Ms. Griffiths did not afford Mrs. Hector an opportunity for her to write her performance plan, instead she threatened Mrs. Hector to write it.  She said, "you don't want me to have to write it."  Mrs. Hector felt threatened and not encouraged that her input would be valued.

57.

On December 11, 2019, Ms. Griffiths knocked on Mrs. Hector's office door as this was her first day back from medical leave.  Mrs. Hector was in her office talking with Terrance Manning another employee in OEEO.  Ms. Griffiths said hello and that she wanted to meet with Mrs. Hector at 1:30 p.m. in Ms. Griffiths office.

When Mrs. Hector went to Ms. Griffiths office for the meeting, Ms. Griffiths was on a call.  Ms. Griffiths told Mrs. Hector that she sent her an email.  When Mrs. Hector returned to her office, she saw the email.  Mrs. Hector did not realize Ms. Griffiths changed the meeting time from 1:30 p.m. to 1 p.m. because she did not see the invite from Ms. Griffiths.

58.

Mrs. Hector read the memo and immediately went to speak to Mr. Mebane. Mrs. Hector informed Mr. Mebane of the memo, and he said that he knew about it, and that she should speak to Ms. Griffiths.  Mrs. Hector stated that she was not comfortable speaking with Ms. Griffiths without a witness.

59.

Mr. Mebane told Mrs. Hector that she could have a witness of her choosing as long as it was not him.  Both Mr. Mebane and Mrs. Hector informed Ms. Griffiths, and all parties agreed that another meeting to discuss the document Ms. Griffiths provided to Mrs. Hector would be.

60.

Neither Mr. Mebane or Ms. Griffiths put stipulations on whom could or could not serve as a witness in the meeting.  After Mrs. Hector informed Ms. Griffiths whom the witness would be, Ms. Griffiths put stipulations on whom could serve as a witness to the meeting/ discussion. Mrs. Hector told Mr. Mebane and he said OK.

Mrs. Hector went to Mr. Mebane and advised him that Ms. Griffiths rejected her proposed witnesses and invited someone from Employee Relations to attend the meeting despite the fact that he had told her that she could select any witness she wanted as long as it was not him.

61.

On January 7, 2020 at 3:12 p.m., Mrs. Hector sent Ms. Griffiths an email asking her when she was going to be available to meet regarding the counseling memo received on December 11, 2019.  Mrs. Hector reminded Ms. Griffiths that they agreed previously that she could have a witness attend since she was not comfortable meeting with her alone.  Ms. Griffiths did not approve of the witnesses that Mrs. Hector selected and therefore they did not meet. Ms. Griffiths wanted the HRO person from employee relations to attend as the witness. She said they were neutral, but Mrs. Hector disagreed.

62.

Mrs. Hector's 2019 evaluation was not a true reflection of her work.  Ms. Griffiths would not provide the data to support the rating provided and said she did not have to.

63.

On January 29, 2020, a PMAP rating from Ms. Griffiths. For the "Leadership and Communication" critical element part, for which Mrs. Hector was rated as "Achieved Expected Results," Ms. Griffiths gave her a 3.0 rating.

64.

This rating was not a fair reflection of Mrs. Hector's work.  Ms. Griffiths did not provide any data to support her justifications when asked.

65.

On Mrs. Hector's 2019 performance evaluation, her comments were the following: "Meeting occurred on 1/29/2020. I do not agree with my rating. I feel I worked very hard last year and contributed to the success of our office, but part of my review suggests otherwise. The first two justifications you have written for my evaluation states that I routinely miss deadlines, and need improvements in building relationships, effectively communicating, and resolving issues. However, the last two justifications states that I'm able to complete complex tasks and communicate well and keep my supervisor inform."

66.

Mrs. Hector asked her rater (Ms. Griffiths) to provide the documentation and data to support the areas that were identified as needing improvement (missed deadline and non-responsiveness to internal and external customers), however, Ms.

Griffiths refused to provide the documentation and she stated, "she had them but was not going to provide the information."

67.

Refusal to provide ample written examples as to when Mrs. Hector did not meet deadlines and the raw data used to configure percentage of deadlines that she missed is unfair to her and against the principles of performance management and SMART standards.

68.

Mrs. Hector believed that the appraisal was subjective and did not accurately reflect her performance for CY2019.

69.

Additionally, on her 2020 performance plan, Mrs. Hector provided the following: Meeting occurred on 1/29/2020.  I have reviewed my 2020 and have immediate concerns with 2 elements:

(1)    Concerns with the measurement and time-bound of the administrative element - Teamwork: Job performance contributes to the successful completion of team assignments by meeting individual deadlines and attending team meetings. Measure : AO - 0 deadlines missed; AM - 1 deadline missed: AE 2 deadlines missed. Time-bound : within performance period. This element does not appear to align the principles of performance management and smart standards. This measurement is

not realistic. Over the course of a rating period an individual could have 1200 deadlines (an average of 100 per month) or more, if you fail to meet 3 deadlines you have not achieved expected results. Deadlines could be missed for a variety of reasons. Are all deadlines going to be tracked or specific ones? If so, this needs to be spelled out and will all employees be rated using the same criteria for this element or will it be subjective. Also, will data and supporting documentation be provided to support the rating;

(2)   Concerns with some of the subcomponents of the required customer service element- Some of the wording appears to be subjective verse's objective, vague, and or non-measurable. This element does not appear to align the principles of performance management and smart standards.

-Provides responsive, reliable, accountable, and respectful customer service, to both internal and external customers.- How is this measured and how are we defining responsive, reliable, accountable and respectful? This appears to be subjective. How will this be monitored and applied across the enterprise and based?

-Resolves most conflicts with minimal input from the team lead. Rarely escalates conflicts and requires little or no supervisory involvement or documentation. Are you not allowed to bring matters to your manager? If you do, after how many issues will it be used against you? This implies that you should not escalate concerns to

your manager. If you bring no concerns to your manager will this mean you are outstanding or exceptional in this area?

-Consistently identifies opportunities for continuous quality improvement and implements practical suggestions to improve customer satisfaction. How is this going to be measured?

- Exercises sound judgment and keen insight regarding sensitive matters, particularly those issues with significant impact to CDC and HHS. How is sound judgement and keen insight defined and measured?

- Identifies and briefs a backup when out of the office for more than one day (i.e., prior to departure, review current workload, issues likely to arise while out of the office, key contacts, etc.). This is the responsibility of the manager or supervisor. Non-supervisors do not have the authority to identify back-up and assign work to other employees.

70.

Mrs. Hector asked management to either remove or provide specific clarification on how the above was rated.

71.

As the system is properly documented, Ms. Griffiths did not enter Mrs. Hector's performance plan into the system until after she was on medical leave. Ms. Griffiths approved the performance plan in the system on July 29, 2019; Mr. Mebane

25

the reviewer approved the plan on July 30, 2019; Ms. Griffith reviewed, certified, and published the performance plan to Mrs. Hector on July 30, 2019. When Mrs. Hector returned to the office in January, she reviewed and acknowledged the plan on January 17, 2020, and indicated that a meeting did not occur.

72.

Ms. Griffiths replied to Mrs. Hector's 2020 performance plan concerns on April 6, 2020. This was nearly three months after she asked for clarification. The responses Ms. Griffiths provided did not resolve Mrs. Hector's concerns.

73.

Mrs. Hector went to Mr. Mebane, and he told her there was nothing wrong with Ms. Griffiths' responses and that Mrs. Hector should seek assistance from "my coach" to resolved. Mr. Mebane and Ms. Griffiths did not take Mrs. Hector's concerns seriously.  The answer was, "you can go to training or talk to a coach." Mrs. Hector was not asking for training, but was asking for clarity and plain language so that they could all be on the same page.

74.

Mr. Mebane is the program director and he refused to address Mrs. Hector's concerns because in his opinion, none of her concerns rises to the level of seriousness or were valid. The message that Mrs. Hector received was sit down, don't say a

word, or you will suffer, and who will believe you because the Agency is always right, you don't matter.

75.

Mrs. Hector received Ms. Griffiths email on June 13, 2019.  She attached a sample format that she wanted Mrs. Hector to use.

76.

In her June 13, 2019 email, Ms. Griffiths said, "…the document to include to our CIO folder process, an appendix section with the link and document for reference and would like the SOP to follow the attached format…"  She further stated, ".please let me know if you would like to discuss."

77.

Mrs. Hector responded by asking Ms. Griffiths to elaborate. Meaning exactly what did she want Mrs. Hector to include, the CIO secure folder process is extensive and separate from this process.   Links and references were already included in the document.

78.

Mrs. Griffiths one-line response was not adequate and did not clarify what she wanted.

79.

Between June 13, 2019, and June 14, 2019, Mrs. Hector received 5 emails from Ms. Griffiths on this assignment.  Ms. Griffiths requested multiple changes. Ms. Griffith sent Mrs. Hector 66 emails between July 26, 2019, through December 10, 2019.

## COUNT I

## SEXUAL DISCRIMINATION
## VIOLATION OF TITLE VII

80.

The foregoing paragraphs are re-alleged, restated and incorporated herein as though fully set forth herein.

81.

Mrs. Hector, a female, is a member of the protected class and entitled to the protections of Title VII, 43 U.S.C. § 2000e, *et seq.,* including, but not limited to, the right to be free from sexual discrimination and harassment in her employment.

82.

During her employment, Mrs. Hector's supervisors subjected her to disparate treatment in the terms, conditions, benefits and privileges of employment, including but not limited to, discriminatory comments and remarks, as set forth above.

83.

Said discrimination and harassment was directed at Mrs. Hector because of her sex, female, and were taken by the supervisory personnel within the CDC in order to deprive her of employment and other employment actions.

84.

The sexual discrimination was severe and pervasive and adversely affected the terms, conditions, and privileges of Mrs. Hector's employment.

85.

Defendant knew or should have known of the harassment and failed to take prompt and remedial action.

86.

Mrs. Hector's efforts to get the harassment stopped resulted in a tangible job detriment.

87.

As a direct and proximate result of Defendants sexual discrimination and harassment, Mrs. Hector was forced to resign and has suffered and continues to suffer economic damages (lost wages and job benefits), loss of an amicable working environment, loss of career and professional opportunities, severe emotional distress, mental anguish, embarrassment, humiliation, and physical suffering.  All of

these damages are as yet undetermined but are believed to be an amount in excess of $75,000.00.

## COUNT II

### TITLE VII – RETALIATION

88.

The foregoing Paragraphs are re-alleged, restated and incorporated herein as though fully set forth herein.

89.

Defendant retaliated against Mrs. Hector for complaining about and opposing discriminatory practices made unlawful by Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000e et. seq., in violation of that statute and participating in protected activity by filing an EEO Discrimination Complaint. Defendant intentionally retaliated against Mrs. Hector and/or acted with deliberate disregard as to whether their actions were unlawfully retaliatory.

90.

Defendant's retaliatory conduct included, but was not limited to, the following:

Adverse Employment Action

A causal connection exists between Mrs. Hector's protected activity and the adverse employment actions set out above and including failing to pay her for the work that

she had been performing and not considering her for promotions.

91.

The adverse action occurred while Mrs. Hector's EEO Complaint was still pending or during the EEOC process and was of a continuing nature so as to have a causal connection between the protected activity and the adverse action.

92.

As a result of Defendant's aforesaid violation of Title VII, Mrs. Hector has suffered and continues to suffer economic injury, including, but not limited to, loss of income because of her constructive discharge.

93.

As a result of Defendant's aforesaid violation of Title VII, Mrs. Hector has suffered and continues to suffer mental anguish and emotional harm.

94.

As a result of Defendant's aforesaid violation of Title VII, Mrs. Hector has suffered and continues to suffer physical injury precipitated by the aforesaid mental anguish and emotional harm.

95.

Defendant acted willfully with deliberate intent to injure Mrs. Hector.

## COUNT III

## REPRISAL DISCRIMINATION
## VIOLATION OF TITLE VII

### 96.

The foregoing paragraphs are re-alleged, restated and incorporated herein as though fully set forth herein.

### 97.

Mrs. Hector is entitled to the protections of Title VII, 42 U.S.C. § 2000e *et seq.*, including but not limited to, the right to be free from retaliation for opposing racial discrimination, sexual discrimination and for prior EEO activity.

### 98.

On several occasions during her employment, Mrs. Hector reported and opposed the harassment and discrimination she was subjected to, including filing an EEO Complaint.

### 99.

Mrs. Hector's supervisors were aware of her protected EEO activities.  She complained to Mr. Mebane and Ms. Griffiths.

### 100.

Each of Mrs. Hector's supervisors were aware of her participation in her own EEO case, as they acknowledged during the investigation.

101.

Because of Mrs. Hector's reports and opposition to the racial harassment and sexual discrimination and asserting her rights, Defendant retaliated and continued to retaliate against Mrs. Hector, including subjecting her to adverse working conditions, made false accusations about her, subjected her to false disciplinary actions, and ultimately, she had to resign from her employment.  Such retaliation and reprisal actions violate 42 U.S.C. § 2000e-3(a).

102.

Despite being aware of Mrs. Hector's protected activity, Defendant, among other things, denied a promotion, relieved of her supervisory responsibilities, forced her to perform work as GS-15 while being paid at GS-14 rates, gave her negative ratings, and forced her to resign.

103.

These acts followed shortly after Mrs. Hector engaged in protected activity.

104.

As a direct and proximate result of Defendant's retaliation and reprisal, Mrs. Hector has suffered and continues to suffer economic damages (lost wages and job benefits), severe emotional distress, mental anguish, embarrassment, humiliation, and physical suffering.  All of these damages are as yet undetermined but are believed to be an amount in excess of $75,000.00.

## COUNT IV

## HOSTILE WORK ENIVRONMENT

### 105.

The foregoing paragraphs are re-alleged, restated and incorporated herein as though fully set forth herein.

### 106.

As set forth above, Defendant created a hostile work environment based upon gender, race, and retaliation.  Mrs. Hector's protected activity included but is not limited to her opposition to discrimination and her participation in protected activity including filing her Complaint for employment discrimination on March 5, 2020.

### 107.

All involved CDC employees were aware of Mrs. Hector's filed Complaint, including but not limited to, Mr. Mebane and Ms. Griffiths.  Included within this environment were adverse actions or material adverse actions within weeks of filing the Complaint as alleged in paragraph 6.

### 108.

The material adverse actions were casually related to Mrs. Hector filing her employment discrimination Complaint against the CDC.  In the case of retaliatory hostile work environment, the environment includes the following material adverse actions alleged in Paragraphs 6:

a.      During February 2019, Complainant stated that her supervisor referred to her as the Administrative Officer rather than as a Management Official.

b.      In Memorandum dated December 11, 2019, Complainant stated that her supervisor falsely stated that she counseled Complainant on April 2, 2019 regarding inappropriate behavior during a meeting with Human Resource Officer (HRO), and on July 26, 2019, Complainant supervisor placed the same information in a summary.

c.      During May 2019, Complainant supervisor spoke to Complainant in a disrespectful manner on two occasions.

d.      During June 2019, Complainant's supervisor dismissed Complainant's professional opinion, but received the professional opinions of other staff members, and instructed Complainant to write Complainant's performance plan.

e.      On June 20, 2019, Complainant was informed by a co-worker (who volunteered assistance) that Complainant's supervisor would not allow the co-worker to assist Complainant on a project.

f.      On June 25, 2019, Complainant was subjected to disrespectful, bullying and threatening behavior.

g.      On July 2019-December 2019, Complainant was removed from the direct reports meeting while all other GS-14 and above employees were allowed to attend.

h.     On January 7, 2020, Complainant was denied a meeting with Complainant's supervisor regarding a letter of counseling received by Complainant on December 11, 2019.

i.     On January 29, 2020, Complainant received a Performance Management Appraisal Program rating that did not accurately reflect Complainant's performance.

109.

The aforesaid actions and conduct have created an intolerable hostile work environment.

110.

As a result of the foregoing, Mrs. Hector has been damaged.  Such damages include, but are not limited to, payment of attorney's fees and legal costs, loss of an amicable work environment, humiliation, anxiety, degradation, embarrassment, physical injury or illness, and severe emotional suffering and distress.  Mrs. Hector will continue in the future to suffer the same damages absent relief from this Court.

WHEREFORE, Plaintiff respectfully requests the Court to award her:

(a)     Compensatory damages, including, but not limited to, economic damages, severe emotional distress, mental anguish, embarrassment, humiliation, and physical suffering, an amount undetermined, but believed to be in excess of $75,000, pursuant to 42 U.S.C. § 2000e-5(g);

(b)     Costs, disbursements, and prejudgment interest pursuant to 42 U.S.C.

§ 2000e-5(k);

(c)     Costs and attorneys' fees as part of the costs pursuant to 42 U.S.C. §

2000e-5(k);

(d)     Any other equitable relief as the court deems appropriate pursuant to

42 U.S.C. § 2000e-5(g);

(e)     The Defendant be required to change the policy, procedures and

practices involving the investigation of discrimination, harassment, and complaints

to OPS; and

(f)     Such other and further relief as this Court deems just and proper.

This 31ˢᵗ day of May, 2022.

Respectfully submitted,

**THE BURKE LAW GROUP LLC**

*/s/ E. Earle Burke_____*
E. Earle Burke
Ga Bar No. 095550
*Attorney for Plaintiff*

199 Peters Street
Suite A
Atlanta, Georgia 30313
Telephone No.: (404) 688-1210
Facsimile No.:  (404) 688-1251
Email: eburke@burkelawatl.com